Filed 4/26/13; mod. filed 5/8/13; pub. order 5/20/13 (see end of opn. for mod. & pub. order)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| In re TOBACCO CASES I | D061077, D061676 |
| | (Super. Ct. No. JCCP 4041) |

CONSOLIDATED APPEALS from orders of the Superior Court of San Diego County, Ronald S. Prager, Judge. Affirmed.


R.J. Reynolds Tobacco Company (Reynolds) challenges trial court orders issued after remand in the last appeal in this matter, which award the People of the State of California $2,943,920.63 in contractual attorney fees as the prevailing parties in an action to enforce a consent decree and final judgment (Consent Decree) entered on a master settlement agreement (MSA). Reynolds contends the court erred in its prevailing party determination because the People did not achieve "greater relief" on the contract as required by Civil Code section 1717 (section 1717), subdivision (b)(1)). Alternatively, Reynolds contends the court erred by applying market rates for San Francisco Bay Area attorneys when determining the lodestar amount of fees, instead of local San Diego

market rates, and by not further reducing the lodestar amount in consideration of the People's partial success.  We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

In November 1998 Reynolds and several other tobacco manufacturers entered into the MSA with most states, including California, to resolve government claims pertaining to public health concerns about smoking and the marketing of tobacco products to minors.  In December 1998 the State and Reynolds signed the Consent Decree, under which the San Diego County Superior Court approved the MSA and retained exclusive jurisdiction over its implementation and enforcement.

One aspect of the Consent Decree permanently enjoins participating tobacco manufacturers from "using or causing to be used" any "cartoon" in the advertising, promoting, labeling or packaging of tobacco products.  The Consent Decree incorporates the MSA's definition of "cartoon," which is "any drawing or other depiction of an object, person, animal, creature or any similar caricature that satisfies any of the following criteria:  [¶]  (1)  the use of comically exaggerated features; [¶]  (2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or [¶]  (3) the attribution of unnatural or extrahuman

_____

1    For convenience we recite some facts from our prior opinions in this matter, *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, and *In re Tobacco Cases I* (2011) 193 Cal.App.4th 1591.

2

abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation."

In 2006 Reynolds launched an advertising campaign called "Farm Rocks" to promote the sale of Camel cigarettes to adult smokers who enjoy rock music performed by artists on independent labels.[2] Reynolds used the campaign in various media, including special advertisements in publications, a promotional compact disc and a Web site. As part of the campaign, Reynolds placed a four-page "gatefold" advertisement in the November 15, 2007 *Rolling Stone* magazine, which was its 40th anniversary edition. The gatefold advertisement consisted of photographic collages, or photomontages, of various fanciful objects. It was placed adjacent to five pages of the magazine's editorial content, which indisputably included cartoons under any definition of the term.

In December 2007 the People moved to enforce the Consent Decree, which embodies the MSA. The People sought injunctive relief, a declaration Reynolds violated the cartoon ban "thousands of times in 2006 and 2007 as part of its Farm Rocks campaign advertisements of Camel cigarettes," and sanctions based on the number of violations. The People's theory was that Reynolds violated the cartoon ban in two ways, by including cartoons in its own advertising, and by having its gatefold advertisement in *Rolling Stone* adjacent to the magazine's editorial pages, which were covered with cartoons (adjacency issue). Pending resolution of the action, Reynolds voluntarily suspended the Farm Rocks

---

[2]     The campaign was also sometimes called Camel Farm, but for consistency we use Farm Rocks throughout the opinion.

campaign and instituted "new [media] insertion guidelines to avoid future adjacency of its ads to cartoons."

Trial began in January 2009, and during opening statement Reynolds represented to the court that it had permanently ceased the Farm Rocks advertising campaign, and thus injunctive relief was unwarranted. After a lengthy trial, the court agreed with that assessment. The court issued a declaration that "a relatively small portion" of Reynolds's images in the Farm Rocks campaign violated the cartoon prohibition. The objectionable images included "jet-powered tractors which fly," "radios flying by means of attached helicopter rotors," "televisions that grow on plant stems," and tractors "with wheels made of film reels able to defy gravity." The court rejected the People's theory on the adjacency issue. The court determined the Consent Decree gives it jurisdiction to assess sanctions against Reynolds, but it declined to do so because its violation of the cartoon ban was unintentional and a relatively small part of the advertisements, the State stipulated there was no proof of the amount of actual damage on which to base a sanctions award, and it would be difficult to quantify the number of persons exposed to the Farm Rocks campaign. In the first appeal in this matter, we affirmed the court's order on the merits. (*In re Tobacco Cases I*, *supra*, 186 Cal.App.4th at pp. 44, 48-52.)

In a subsequent proceeding, the trial court awarded the People $707,882.50 in attorney fees, and $32,673 in other costs, under a provision in the Consent Decree. The court rejected Reynolds's argument that section 1717 applies to the Consent Decree, and alternatively determined that even if the statute is applicable, the People prevailed because they won on the "significant issue" of whether Reynolds violated the Consent

4

Decree by using banned cartoons in its Farm Rocks campaign. The court denied Reynolds's request to apportion fees based on the People's lack of success on the adjacency issue on the ground the People had already reduced their fee request by 15 percent.

Reynolds appealed, and we reversed the order. We agreed with Reynolds that section 1717 is applicable to the Consent Decree. We directed the court to determine on remand whether the People were the prevailing parties under section 1717, meaning they obtained the "greater relief" on the contract. (§ 1717, subd. (b)(1).) (*In re Tobacco Cases I*, *supra*, 193 Cal.App.4th at p. 1598.)

The People cross-appealed, contending the court erred by denying them prevailing market rates on the ground the Consent Decree provides for an award of fees "incurred" by the People, rather than for an award of reasonable fees. For the court's convenience on remand, we addressed the contention, explaining that when section 1717 applies, as here, the prevailing party is entitled to "reasonable" fees (§ 1717, subd. (a)), meaning the rates prevailing in the community for similar work. (*In re Tobacco Cases I*, *supra*, 193 Cal.App.4th at p. 1596.)

On remand, both parties moved for designation as the prevailing party under section 1717. In an October 5, 2011 order, the court found in favor of the People. The order explains that while the People "did not achieve a simple, unqualified win, it is the prevailing party since it achieved its main litigation objective of *stopping said campaign* [Farm Rocks] *in California.* Before this action was instituted, [Reynolds] had been engaging in a multistate advertising campaign which involved the use of certain cartoons

5

that this Court found to be prohibited by the MSA."  The order also granted the People's request for an award of $32,673.02 in litigation costs.  The People then moved for attorney fees, and in a March 22, 2012 order the court awarded $2,943,920.63 in fees based on Bay Area market rates, as their attorneys were from Oakland.  These consolidated appeals of the orders followed.

## DISCUSSION

## I

## *Prevailing Party Determination*

## A

Reynolds contends the trial court abused its discretion by finding the People were the prevailing parties under section 1717.  Reynolds asserts that given the People's limited success, the court should have found that either Reynolds prevailed or no party prevailed.  We are unpersuaded.

Section 1717, subdivision (a) provides for an award of attorney fees to "the party prevailing on the contract."  Under section 1717, subdivision (b)(1), the prevailing party is the party "who recovered a *greater relief* in the action on the contract."  (Italics added.)  Section 1717 allows "those parties whose litigation success is not fairly disputable to claim attorney fees as a matter of right."  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.)

"If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees."  (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109; § 1717, subd. (b)(1).)

"[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party [had] succeeded and failed to succeed in its contentions.' " (*Hsu v. Abbara*, *supra*, 9 Cal.4th at p. 876.)

"[I]n determining litigation success, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' For example, a party who is denied direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the party has otherwise achieved its main litigation objective." (*Hsu v. Abbara*, *supra*, 9 Cal.4th at p. 877, italics omitted.) The court may "examin[e] the results of the action in relative terms: the general term 'greater' includes '[l]arger in size than others of the same kind' as well as 'principal' and '[s]uperior in quality.' " (*Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1151.)

A trial court has broad discretion in determining which party has obtained greater relief on the contract, and we will not disturb such a determination on appeal absent a clear abuse of discretion. (*Ajaxo Inc. v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 58.) " ' "Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence." ' " (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1351.) We are required to uphold a reasonable ruling even if we may not have ruled the same way and a contrary ruling would also be sustainable. (*Shamblin v.*

7

*Brattain* (1988) 44 Cal.3d 474, 478-479; *Ross v. Ross* (1941) 48 Cal.App.2d 72, 76 ["there are cases in which an order either way will be sustained on the ground that no abuse of discretion appears"].)

B

Reynolds asserts the People did not obtain greater relief within the meaning of section 1717, subdivision (b)(1), because the court denied them injunctive relief and sanctions, and only issued a declaration that "a relatively small portion" of images in the Farm Rocks advertising campaign violated the MSA's cartoon ban. Reynolds submits, as unassailable fact, that success on the adjacency issue was the People's main litigation objective, and their position on Reynolds's own use of cartoons in the Farm Rocks campaign was merely incidental.

On this record, however, we cannot say the trial judge, Ronald Prager, who has handled this litigation from its commencement, abused his broad discretion. As he explained in rejecting Reynolds's argument as to the primacy of the adjacency issue, "I was here. I sat through all the motions. I heard all the arguments."[3]

Reviewing the *Hsu v. Abarra*, *supra*, 9 Cal.4th at pp. 876-877 factors, we reject the notion the court's ruling contravenes uncontradicted evidence. In December 2007 the People applied for an order to show cause "why [Reynolds] should not be immediately

_____

[3] Judge Prager signed the Consent Decree in 1998, and his rulings were under review in *In re Tobacco Cases I, JCCP 4041* (2004) 124 Cal.App.4th 1095; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253; *In re Tobacco Cases I*, *supra*, 186 Cal.App.4th 42; and *In re Tobacco Cases I*, *supra*, 193 Cal.App.4th 1591, as well as the instant appeals.

restrained from using cartoons in its advertising in *Rolling Stone*, its web site or any other venue." The application stated: "A central provision of the Consent Decree and the MSA, intended to further the MSA's goals of reducing underage tobacco use and promoting public health, is the prohibition against taking any action, either directly or indirectly, to target youth in the advertising of tobacco products. Cartoons in cigarette advertising are specifically prohibited in the MSA and the Consent Decree. . . . Reynolds has violated these prohibitions by its cartoon laden Farm Rocks promotions in its nine page advertisement spread in the November 15, 2007 *Rolling Stone* magazine, its web site www.thefarmrocks.com and other promotional events."

In February 2008 the People filed an amended motion to enforce the Consent Decree, which alleged: "Reynolds has used cartoons as defined in and prohibited by the Consent Decree thousands of times in 2006 and 2007 as part of its Farm Rocks campaign advertisements of Camel cigarettes." The motion went on to describe Reynolds's own Farm Rocks images, including "flying tractors with movie reels for wheels, flying radios, [and] stereo speakers growing from plant stalks out of the ground," and to complain that Reynolds used the images "in California on the Reynolds-sponsored Farm Rocks web site, in newspaper and magazine advertisements, in mailings and on other items distributed by mail or at various Reynolds sponsored musical events, or projected on walls at these events. Reynolds also advertised Camels in a nine-page advertising spread in the 40th edition, November 15, 2007, issue of the *Rolling Stone* magazine, which contains hundreds of prohibited cartoon images." Both the application and the motion allege Reynolds's own use of cartoons in its advertising, not only in the *Rolling Stone*, but

also in other media. Neither the application nor the motion expressly refers to the adjacency issue. The pleadings refer only opaquely to the adjacency issue by citing a nine-page advertisement in *Rolling Stone*, when Reynolds's own advertisement was four pages,[4] and by referring to "hundreds of prohibited cartoon images," which presumably includes cartoons provided both by Reynolds and *Rolling Stone*.

The People's trial brief devoted roughly nine pages to the issue of Reynolds's own images in various media and roughly three pages to the adjacency issue. Further, in opening statement, the People's counsel spent somewhat more time on the issue of Reynolds's own cartoons than on the adjacency issue.

Reynolds asserts that during the lengthy trial, Judge Prager "repeatedly observed" that the adjacency issue "was the central merits issue." Reynolds, however, gives only *two* supporting citations to the reporter's transcript. During the People's opening statement, Judge Prager questioned whether they would have brought the action based exclusively on Reynolds's own use of cartoons, and their counsel responded affirmatively. At the end of trial, Judge Prager stated: "What happened in this case, I think we all know what happened in this case, when [the People] saw . . . the anniversary

---

4       As we noted in *In re Tobacco Cases I*, *supra*, 186 Cal.App.4th at p. 45, Reynolds's "four advertisement pages essentially bracketed five pages of Rolling Stone's editorial content, titled 'Indie Rock Universe.' (Some capitalization omitted.) Rolling Stone created the editorial pages, which consisted of hand-drawn illustrations of such things as a 'rocket-powered guitar, a guitar-playing robot, [and] a planet with a human mouth containing human-life teeth.' There is no dispute that the images on the editorial pages were cartoons under any definition."

issue of *Rolling Stone* and they saw what was seemingly . . . [a Reynolds] ad, blatant violation of the cartoon proscription of the MSA, that they reacted."

Reynolds also points out that in his final statement of decision, Judge Prager wrote that the People's enforcement action was "based not only on the contents of the [*Rolling Stone*] ad itself but especially based on the fact that it was adjacent to and intertwined with cartoons contained in the *Rolling Stone* editorial." Reynolds seizes on the word "especially."

Judge Prager's limited comments, however, are an insufficient ground for us to second guess his own unequivocal finding that the People's main litigation objective was stopping Reynolds's use of its own cartoons in advertising in California in a variety of venues, and by achieving that objective they were the prevailing parties. As Judge Prager noted, the People argued the definition of "cartoons" in the MSA was not "the popular definition of cartoons," and the People "pushed the envelope on that and they won on that." He found the People believe in the importance of the MSA, and insisted on a construction of the term "cartoon" "according to the strict letter of the law."

Indeed, as we observed in *In re Tobacco Cases I*, *supra*, 186 Cal.App.4th at p. 50, the Farm Rocks "campaign's fanciful imagery would appeal to youth," and "Reynolds and other tobacco companies have a history of targeting youth in their advertising while professing ignorance of wrongdoing." (Citing *United States v. Philip Morris USA, Inc.* (D.D.C. 2006) 449 F.Supp.2d 1, affirmed in relevant part in *United States v. Philip Morris USA, Inc.* (D.C.Cir. 2009) 566 F.3d 1095, 1106-1106.) The litigation advanced

11

the State's significant interest in protecting youth from the perils of smoking, a principal purpose of the MSA.

Further, Judge Prager expressly rejected Reynolds's argument that the lack of injunctive relief or sanctions precluded him from designating the People as prevailing parties. The People sought injunctive relief "to restrain Reynolds from using cartoons in this [Farm Rocks] campaign or in any other campaign in the future." Judge Prager withheld injunctive relief because during opening statement at trial, Reynolds's counsel represented it had decided to *permanently* cease the campaign, "[s]o there's nothing to really enjoin." Likewise, Judge Prager denied sanctions, in part, to essentially reward Reynolds for voluntarily ceasing the campaign. From the case's inception, and continuing throughout trial, Reynolds vigorously denied that *any* of its own images were cartoons within the meaning of the MSA. Reynolds's attempt to now characterize its use of cartoons as trivial is not well taken. We are satisfied that Judge Prager's ruling

constitutes a proper exercise of discretion.[5]  Given our holding, we are not required to address Reynolds's argument the People are not entitled to costs because they were not the prevailing parties.

## II

### *Amount of Attorney Fees*

### A

### 1

In *In re Tobacco Cases I*, *supra*, 193 Cal.App.4th 1591, 1604-1605, we held that if the trial court determined on remand that the People prevailed under section 1717, they were entitled to attorney fees measured by market rates rather than the governmental rates of in-house counsel actually incurred.  The People, who were represented principally by two assistant attorneys general from the Oakland office of the State's Tobacco Litigation and Enforcement Section (Tobacco Section), requested and were awarded market rates for the San Francisco Bay Area of between $500 and $625 per

---

[5]    In designating the People as the prevailing party, even though injunctive relief was unavailable because of Reynolds's announcement at trial that it had ceased the Farm Rocks campaign, the court relied on *De La Cuesta v. Benham* (2011) 193 Cal.App.4th 1287 (*De La Cuesta*), an unlawful detainer action.  *De La Cuesta* held the landlord prevailed under section 1717 even though the tenant vacated the premises the day before trial, and thus no injunctive or declaratory relief was available, as the landlord recovered 70 percent of the back rent he sought.  (*De La Cuesta*, at p. 1296.)  The opinion explains, "And then there is the reality of litigation, almost universally recognized:  Attorneys tend to err on the side of overstating the extent of the claims being presented on their client's behalves.  If anything short of 'complete victory' allows the trial court unrestricted freedom to ignore the *substance* of a result, then trial courts have the freedom to nullify the normal expectations of parties who enter into contracts with prevailing party attorney fee clauses." (*Id.* at p. 1295.)  Reynolds asserts *De La Cuesta* is factually inapposite, but with or without the opinion our conclusion is the same.

hour.  Reynolds contends that even assuming the People prevailed under section 1717, the court erred by not calculating the lodestar amount with local San Diego market rates. Again, we disagree.

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' "  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "Generally, the reasonable hourly rate used for the lodestar calculation 'is that prevailing in the community for similar work.' "  (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 616 (*Center for Biological Diversity*); *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 ["the lodestar is the basic fee for comparable legal services in the community"].)

The court has the discretion to make an exception, however, when the prevailing party shows it was impracticable to use local counsel.  As explained in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 395, 399 (*Horsford*), the California Supreme Court "has never hinted that, in the unusual circumstance that local counsel is unavailable, the trial court is limited to the use of local hourly rates."  The court may use out-of-area "rates either in calculating the initial lodestar figure or in evaluating whether to award a multiplier to a lodestar initially based on local hourly rates." (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2010) 190 Cal.App.4th 217, 248 (*EPIC*).)  *Horsford*, *supra*, at

14

p. 399, explains, "we doubt a plaintiff needs to make anything more than 'a good-faith effort to find local counsel' [citation] in order to justify the fees of out-of-town counsel." (Accord, *Center for Biological Diversity*, *supra*, 188 Cal.App.4th at p. 603.)

Reynolds asserts the People failed to establish it was impracticable to use assistant attorneys general from the Tobacco Section's San Diego office. The evidence, however, amply supports the court's finding to the contrary. The People submitted the declaration of Dennis Eckhart, a former senior assistant attorney general who was head of the Tobacco Section when this litigation began in 2007. The declaration states Eckhart assigned and supervised Jeanne Finberg and Shari Posner, from the Tobacco Section in Oakland. The declaration describes Finberg as "a very experienced litigator," and states she "had the most knowledge of Reynolds's then-current advertising campaigns . . . and she was immediately available to seek an order to show cause on an expedited basis to halt the . . . Farm Rocks campaign." It also states Posner is "also an experienced litigator, whose skills . . . would complement . . . Finberg's."

Additionally, the declaration states there were only two attorneys in the Tobacco Section's San Diego office when the litigation began, they "were the least experienced litigators in the section, and both were heavily committed to other cases." Further, in past litigation under the MSA the State had assigned Sacramento or Oakland attorneys.

The People also submitted the declaration of Karen Leaf, a senior assistant attorney general who succeeded Eckhart in heading the Tobacco Section. The declaration states, "It is not possible to assign all of the MSA enforcement work to

15

San Diego attorneys, nor would it be advisable for the office to attempt to do so. Therefore, case assignments for the Section are made based on a variety of factors which include the complexity of the case, [and] the experience and work load of the attorney." Leaf kept Finberg assigned to the case because she "is a highly experienced litigator and the attorney in the Section with the most experience in litigating attorneys' fees." The court's ruling was well within its discretion.

## 2

According to Reynolds, the People did not need experienced litigators from the Tobacco Section's Oakland office who were more familiar with the MSA and Consent Decree than the attorneys with the San Diego office, because in *In re Tobacco Cases I*, *supra*, 186 Cal.App.4th 42, this court held as a matter of law that the MSA's definition of "cartoon" is unambiguous. Reynolds submits that given our finding of lack of ambiguity, the case was not complex and the People's attorneys "required *no* expertise about the MSA." According to Reynolds, the People are not entitled to rates higher than Reynolds paid its local law firm, Wright & L'Estrange.

This theory strikes us as absurd. In addition to retaining Wright & L'Estrange, Reynolds assembled a team of attorneys from the Jones Day law offices in Washington D.C. and Ohio, who, according to the trial court, "had the laboring oar," and from the national law firm of Womble Carlyle Sandridge & Rice, LLP.

Reynolds then engaged in the type of litigation tactics pejoratively referred to as "scorched earth," presumably to cause delay and increase the People's (and the trial court's) financial burden. Instead of responding in good faith to the merits, Reynolds

16

raised a variety of unmeritorious procedural roadblocks under various provisions of the MSA and Consent Decree. In its final statement of decision, Judge Prager determined "there is no procedural bar to this action because of the State's alleged failure to give good faith consideration to whether [Reynolds] had taken appropriate and reasonable steps to cause the claimed [cartoon] violation to be cured because of the futility of further discussions in light of Reynolds' categorical denial its ads violated the cartoon prohibition in the MSA/Consent Decree and because Reynolds has been accused many times of violating the cartoon prohibition of the MSA/Consent Decree and has been held responsible for many violations of the public health provisions of the MSA regarding advertising." In the attorney fee proceedings, Judge Prager observed the People "had to defend, they had to fight every step of the way. They had to fight all these procedural motions. Every step of the way was very hotly contested."

Moreover, Reynolds vigorously argued the definition of "cartoon" in the MSA *was* ambiguous, and thus its meaning was subject to proof by parol evidence, and the term must be narrowly construed to protect its First Amendment free speech rights. Judge Prager noted, "Even the definition of cartoon . . . was very hard fought in this case."

Reynolds called numerous witnesses to give their opinions on the meaning of the term "cartoon," including its own employees, representatives from its advertising agency, and a designated expert witness. Reynolds actually designated two expert witnesses, both of whom the People were required to depose. The People argued expert testimony on the interpretation of the Consent Decree was improper, to no avail. In *In re Tobacco Cases I*, *supra*, 186 Cal.App.4th at p. 50, we found the MSA's definition of "cartoon" to be

17

unambiguous as a matter of law, but hindsight does not affect the People's need for experienced litigators.

The People's expert on attorney fees, Daniel M. Pearl, stated in a declaration that Reynolds is "one of the wealthiest, most intransigent and unrelenting defendants that any litigant can face," and Reynolds's "attorneys fought this case tooth and nail, contesting almost every issue." Given this climate, the People could not reasonably be expected to use the Tobacco Section's least experienced attorneys. As Eckhart stated in his declaration, "Looking back over the four-year course of this action, I believe the special knowledge about the MSA and Consent Decree possessed by Ms. Finberg, Ms. Posner and their Tobacco Section colleagues was essential to the State's success, both in the ultimate result and in several procedural rulings along the way." Reynolds's assertion that "if the State had limited its case to the winning claim concerning the [Farm Rocks] program, the case obviously would have been resolved quickly and cheaply," is ludicrous.

Notably, the People presented evidence that Reynolds's attorneys billed it substantially more in attorney fees than the $2,943,920.63 the People sought and were awarded, and we presume the court considered it.[6] "In a contest over what time was reasonably and necessarily spent in the preparation of a case, it is obvious that the time that the opposition found necessary to prepare its case would be probative. Each party

_____

[6]     Over the People's objection, the trial court granted Reynolds's motion to seal all information pertaining to the hourly rates of its attorneys and the amount of fees it incurred. On our own motion, we ordered the records unsealed after giving the parties notice and the opportunity to brief the matter. (Cal. Rules of Court, rule 8.46(f)(3).)

18

must prepare to question the same witnesses, must review the same documents and other evidence, and must anticipate a presentation by the opposition of a complexity related to the facts in issue. Similarly, work on pretrial motions would reflect what volume of work opposing attorneys deemed reasonable." (*Stastny v. Southern Bell Telephone and Telegraph Company* (W.D. N.C. 1978) 77 F.R.D. 662, 663-664; *Blowers v. Lawyers Co-op. Pub. Co., Inc.* (D.C.N.Y. 1981) 526 F.Supp. 1324, 1327 ["The amount of time spent by defendants' attorneys on a particular matter may have significant bearing on the question whether plaintiff's attorney expended a reasonable time on the same matter."]; *Dupont Plaza Hotel Fire Litigation* (1st Cir. 1995) 56 F.3d 295, 301 [decision whether to allow discovery of information regarding fees and expenses of opposing counsel is generally within trial court's discretion].)

B

1

Lastly, Reynolds contends the trial court abused its discretion by not sufficiently reducing the lodestar amount of attorney fees under section 1717 to reflect the People's limited success. Reynolds asserts the People's voluntary reduction of fees by 15 percent was insufficient, and the court should have reduced fees between 33 and 50 percent. We conclude Reynolds's position lacks merit.

In their fee request, the People argued the fees incurred on the two issues pertaining to the Consent Decree's cartoon ban—Reynolds's own use of cartoons in the Farm Rocks campaign and the adjacency issue—were largely inextricably intertwined,

19

and thus no apportionment was warranted. The People nonetheless voluntarily reduced their fee request to reflect their lack of success on the adjacency issue.

The People submitted a declaration by lead attorney Finberg, which states: "Although most of the time in the case is not severable, the People have identified some time that can be attributed almost exclusively to the [adjacency issue] claim. These hours are primarily time spent preparing, attending and taking the depositions of *Rolling Stone* employees. Shari Posner identified this time on her billing records as time that was attributable to the [adjacency issue] claim, . . . and we have *completely excluded those hours from our fee claim*." (Italics added.)

The Finberg declaration also explains, "Although other time was spent prosecuting this claim, it is not possible to tell from the billing records time that is specifically attributable to this claim. Consequently, the People have applied a percentage discount so as to exclude time spent solely on this claim. The People believe that 10 to 15% of the time is reasonably attributable to the unsuccessful claim. Consequently, the People have *discounted all of our time* by 15%." (Italics added.)

The People also submitted a supplemental declaration by Finberg, which explains she arrived at the 15 percent figure by reviewing the parties' joint exhibit list for trial, and identifying exhibits that (1) pertained either solely to the prevailing claim on Reynolds's own Farm Rocks images, or jointly to that issue and the adjacency issue, and (2) solely to the adjacency issue. Only four of the People's 150 exhibits that were admitted pertained solely to the adjacency issue. Finberg also determined that only one of the parties' 37 stipulations of fact pertained solely to the adjacency issue.

20

Additionally, the People presented a declaration by Posner, who was principally responsible for handling discovery. The declaration states that 88 percent of the People's discovery requests and 86 percent of Reynolds's discovery requests were related directly to or inextricably linked to Reynolds's own use of cartoons.

"Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 (*Reynolds*).) "Attorney's fees need not be apportioned when incurred on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Id.* at pp. 129-130.) Depending on the particular circumstances, however, a court may "apportion fees even where the issues are connected, related or intertwined." (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1365; accord, *Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 443; *Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 108.)

Here, the People's sole claim against Reynolds was contractual, to enforce the Consent Decree. While the People had two *theories* on how Reynolds violated the cartoon ban, no apportionment of fees between contract and non-contract claims is at issue. *Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385 (*Acree*), held the trial court properly exercised its discretion by not apportioning attorney fees under section 1717 when the plaintiff's successful and unsuccessful claims were all based

21

on the same contract and the same contractual relationship. (*Acree*, *supra*, at p. 405, citing *Reynolds*, *supra*, 25 Cal.3d at pp. 129-130.)

Here, likewise, the People's successful and unsuccessful contract theories are based on the Consent Decree and the same contractual relationship. To any extent no apportionment was required, however, the People voluntarily excluded fees attributable solely to the adjacency issue and reduced their remaining fees by 15 percent.

"The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court. [Citation.] The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong. [Citations.] The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that is shocks the conscience and suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.)

Given the People's evidence, we cannot say the court abused its broad discretion under section 1717 by not further reducing the lodestar amount. While Reynolds disagrees with the People's showing on the 15 percent figure, by arguing, for example, that Finberg falsely claimed some of the trial exhibits were related to the People's successful claim on the cartoon issue, we are not at liberty to reweigh the evidence or reappraise witness credibility. (*Tesoro Del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 634.) Rather, " ' "[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error

22

must be affirmatively shown." ' " (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1140.) Judge Prager noted, "[R]arely do I see records as complete as the [Attorney General] has submitted in this case."

Further, the $2,943,920.63 attorney fees award does not shock our conscience or suggest any passion or prejudice. Under section 1717, the "major factors the trial court must consider in determining an attorneys' fee award include: the nature of the litigation and its difficulty; the amount of money involved in the litigation; the skill required and employed in handling the litigation; the attention given to the case; the attorney's success, learning, age and experience in the particular type of work demanded; the intricacy and importance of the litigation; the labor and necessity for skilled legal training and ability in trying the case; and the amount of time spent on the case. [Citations.] When apprised of the pertinent facts, the trial court may rely on its own experience and knowledge in determining the reasonable value of the attorney's services." (*Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1507; *Acree v. General Motors Acceptance Corp.*, *supra*, 92 Cal.App.4th at p. 404.)

Judge Prager reasonably determined the fees were proper in light of the above factors.[7] "The basis of the broad discretion afforded to the trial judge in ruling on an attorney fee motion is the judge's familiarity with the proceedings and the work

_____

[7] An additional factor here is that Reynolds's numerous unsuccessful pretrial motions on procedural issues, which were unrelated to the merits of the unsuccessful *Rolling Stone* adjacency issue, naturally increased the People's fees.

23

performed by the attorneys."  (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 346.)

2

Reynolds relies heavily on *Hensley v. Eckerhart* (1983) 461 U.S. 424 (*Hensley*), in which the United States Supreme Court articulated a two-step standard governing an award of attorney fees to a prevailing party under a *federal civil rights statute*, 42 United States Code section 1988 (section 1988), in cases of limited success.  (*Hensley*, *supra*, 461 U.S. at p. 426.)  *Hensley*, however, does not affect our holding.

"The first step [of *Hensley*] asks whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded[.]'  [Citation.]  In the first step of the *Hensley* inquiry, charges included in the initial lodestar calculation are 'subject to challenge . . . as being unrelated to the plaintiff's successful claims.'  [Citation.]  Thus, this step requires a court to examine whether the prevailing party's unsuccessful claims are related to its successful ones."  (*EPIC*, *supra*, 190 Cal.App.4th at pp. 238-239*,* citing *Hensley*, *supra*, 461 U.S. at pp. 434-435.)  "If successful and unsuccessful claims are *related*, the court proceeds to the second step of [the] *Hensley* inquiry, which asks whether 'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'  [Citation.]  In this step, the court will 'evaluate the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." '  [Citations.]  Full compensation may be appropriate where the plaintiff has obtained 'excellent results,' but may be excessive if 'a plaintiff has achieved only partial or limited success.'  [Citation.]  'The court may

24

appropriately reduce the lodestar calculation "if the relief, however, significant, is limited in comparison to the scope of the litigation as a whole." ' " (*EPIC*, *supra*, at p. 239.)

Reynolds cites the trial court's initial order on attorney fees, which states: "The second issue is whether the fees should be apportioned. In *Hensley* . . . , the U.S. Supreme Court held that courts should deduct from a lodestar amount for an unsuccessful claim *only if the claim is distinct in all respects*. Here, the parties provided conflicting evidence regarding the amount of time spent on each issue. . . . Notably, Plaintiff informed the Court that it has already applied a 15 percent deduction to its fees it incurred for the unsuccessful claim. . . . After reviewing the evidence provided by both parties, the Court finds that the 15 percent deduction by the Plaintiff was sufficient." (Italics added.)

Reynolds asserts the italicized language shows the court refused or neglected to undertake the second step of *Hensley*, under which it could reduce the lodestar amount even if it found the People's two contract theories were *related*, based on the insignificance of the People's success in comparison to the overall litigation. The initial fee order, however, is not under review here. The subsequent fee order, which is under review, states, "As to Defendant's partial success argument, the Court reiterates its previous determination that the 15 percent deduction by the Plaintiff was sufficient." This order does not mention *Hensley*, it merely reapproved the People's 15 voluntary percent reduction. The court was not required to explain its rationale for the final fee award absent a request for a statement of decision (*Ketchum v. Moses*, *supra*, 24 Cal.4th

25

at p. 1140; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294), which Reynolds did not make.

Thus, to any extent the particular two-step *Hensley* apportionment standard may be applicable to section 1717,[8] we infer the court complied with the standard or its equivalent. We are confident the court knew it could further reduce the lodestar amount for related contract claims, as again, California law similarly gives the court discretion to "apportion fees even where the issues are connected, related or intertwined." (*El Escorial Owners' Assn. v. DLC Plastering, Inc.*, *supra*, 154 Cal.App.4th at p. 1365.)

We have considered each of the numerous points Reynolds has raised within its main contentions, and while we may not address every one of them (see *Linhart v. Nelson* (1976) 18 Cal.3d 641, 645; *People v. Rojas* (1981) 118 Cal.App.3d 278, 289-290), we are satisfied the awards of attorney fees and costs comport with the court's broad discretion.

---

[8] California courts have applied *Hensley* to section 1988 cases (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 418 (*Harman*)), and to state statutes found to be analogous to section 1988. (See, e.g., *Mann v. Quality Old Time Service, Inc.*, *supra*, 139 Cal.App.4th at pp. 343-344 [Code Civ. Proc., § 425.16]; *EPIC*, *supra*, 190 Cal.App.4th 217 [Code Civ. Proc., § 1021.5].) Reynolds, however, cites no California opinion applying *Hensley's* two-step apportionment standard to contractual attorney fees under section 1717. In dicta, *Harmon*, *supra*, 158 Cal.App.4th at p. 416, footnote 6, states the *Hensley* standard "or the equivalent" has been applied to awards made under section 1717. As authority, *Harmon* cites *Wood v. Santa Monica Escrow Co.* (2007) 151 Cal.App.4th 1186, and this court's opinion in *Del Cerro Mobile Estates v. Proffer* (2001) 87 Cal.App.4th 943, neither of which mentions *Hensley* or an equivalent two-step apportionment standard.

DISPOSITION

The orders are affirmed.  The People are entitled to costs on appeal.

McCONNELL, P. J.

I CONCUR:

McINTYRE, J.

I CONCUR IN THE RESULT:

HUFFMAN, J.

Filed 5/8/13

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| In re TOBACCO CASES I | D061077, D061676 |
| | (Super. Ct. No. JCCP 4041) |
| | ORDER MODIFYING OPINION |
| | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 26, 2013 be modified as follows:

1.  On page 18, the first full sentence of the first full paragraph, the name "Daniel M. Pearl" is changed to "Richard M. Pearl" so the sentence reads:

> The people's expert on attorney fees, Richard M. Pearl, stated in a declaration that Reynolds is "one of the wealthiest, most intransigent and unrelenting defendants that any litigant can face," and Reynolds's "attorneys fought this case tooth and nail, contesting almost every issue."

**There is no change in the judgment.**

McCONNELL, P. J.

Filed 5/20/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re TOBACCO CASES I | D061077, D061676 |
| | (Super. Ct. No. JCCP 4041) |
| | ORDER CERTIFYING OPINION |
| | FOR PUBLICATION |

THE COURT:

The opinion filed April 26, 2013 is ordered certified for publication.

The attorneys of record are:

Wright & L'Estrange, Robert C. Wright; Jones Day, Noel J. Francisco, for

Defendant and Appellant R.J. Reynolds Tobacco Company.

Kamala D. Harris, Attorney General, Karen Leaf, Assistant Attorney General, and

Jeanne Finberg, Deputy Attorney General, for Plaintiff and Respondent State of

California.

McCONNELL, P. J.