Filed 1/26/23  D'Souza-Ronquillo v. Ronquillo CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ABIGAIL D'SOUZA-RONQUILLO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD RONQUILLO,<br><br>    Defendant and Appellant. | B316049<br><br>(Los Angeles County<br>Super. Ct. No.<br>20STRO06687) |

APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth Scully, Judge.  Affirmed as modified.

Edward Ronquillo, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Edward Ronquillo, representing himself, appeals from a three-year domestic violence prevention restraining order, protecting his then-wife, Abigail D'Souza Ronquillo, and their young daughter.[1] He contends the trial court engaged in racial bias against him when it found (1) Abigail was credible and (2) there was sufficient evidence to grant the restraining order. The record does not support Edward's contention of error. As we explain below, we order the trial court to modify the restraining order to reflect the correct date the trial judge signed the order. As so modified, we affirm the order.

## BACKGROUND

### I. Abigail's Request for a Restraining Order and Edward's Response

#### A. Abigail's moving papers

On December 9, 2020, Abigail, through counsel, filed an ex parte request for a domestic violence prevention restraining order against Edward, protecting herself and their one-and-a-half-year-old daughter. (Fam. Code, § 6200 et seq.)[2] In her declaration accompanying the request, Abigail stated she and Edward had been married since 2017.

According to Abigail's declaration, she and Edward had been experiencing marital problems. A few months before she filed her request for a restraining order, Edward threatened to kill himself in front of her and their daughter. When she attempted to calm him down, he screamed at her and told her he

---

[1] Hereafter, we refer to the parties to this action by their first names to avoid confusion.

[2] Undesignated statutory references are to the Family Code.

2

would kill her.  Around three weeks before she filed this request, Edward, in front of Abigail and their daughter, grabbed one of four guns he kept around the house and held it to his head as he threatened to kill himself.  Abigail stated Edward kept his guns "unlocked and out in plain sight."  Around two weeks before she filed her request for a restraining order, as she was leaving the house to go grocery shopping, she noticed Edward had a gun "loose on the piano," near where their daughter was playing.  When she asked him to lock the gun in his safe he became angry, but he complied after "[m]uch hesitation."

According to Abigail's declaration, at some point in between the above-described events, Edward "insisted" the couple attend marriage counseling.  When Abigail "tried to speak with the marriage counselor in private, [Edward] got suspicious and upset and fired the marriage counselor on the spot."  Abigail described Edward as "very controlling, paranoid, and suspicious."

Abigail also described in her declaration a November 26, 2020 incident of physical violence that she asserted Edward committed against her.  At around 9:30 p.m., Edward became upset with her because she did not want to watch television with him.  He had demanded she "spend 30 minutes alone with him every night" and, on this occasion, he told her that she " 'needed to obey him' " and watch television with him.  She explained to him that she needed to put their daughter to sleep because it was getting late.  He became angry and repeatedly yelled at her to leave his house.  She told him it was late, and she did not have a place to go.  He responded by shouting profanities at her.

Fearing that Edward might hit her, Abigail carried their daughter into the daughter's bedroom and closed the door.  Edward "started banging on the door and then rushed into the

room and kicked [Abigail's] legs and continued to demand that [she] get out," while Abigail was holding their daughter. He called Abigail "a demon" and continued to yell. As Abigail and their daughter cried, Edward took the child from Abigail and put her to sleep. Thereafter, Edward continued to yell at Abigail through the night, demanding she keep her eyes open and not fall asleep.

Abigail stated in her declaration that on December 8, 2020, she left the family home with her daughter and went to stay with a family member.[3]

On December 9, 2020, the day Abigail filed her ex parte request, the trial court granted a temporary restraining order against Edward, protecting Abigail and their daughter.

## B. Edward's written response and accompanying exhibits

On December 23, 2020, Edward, as a self-represented litigant, filed a declaration in response to Abigail's request for a permanent domestic violence prevention restraining order. Therein, Edward denied he ever committed any physical violence against Abigail or threatened to kill her. He also denied he threatened to kill himself in front of their daughter. Edward stated Abigail threatened to kill herself in 2016, before they were married, when he told her he wanted to end their relationship because he witnessed her "lack of charity to a homeless" person. He also stated that in 2017, after they were married, Abigail once kicked him "extremely hard in [his] back" and addressed him

---

[3] In her testimony at an April 15, 2021 evidentiary hearing discussed below, Abigail stated that she left the family home one day later, on December 9, 2020.

with profanity and other derogatory comments because she was unhappy they were living with his parents (before they moved into their own house).

Edward further stated in his declaration that Abigail's brother and his wife, with whom Abigail left the day she filed the request for a restraining order, "would often make rude and racist comments" about Mexico and Mexicans, knowing Edward was of Mexican descent. Edward told Abigail he did not want them to be his daughter's godparents based on "their racist statements" and other comments.

According to Edward's declaration, after their daughter's birth in 2019, Abigail spent less time alone with him (without their daughter), and he asked her for more time. About a year later, Abigail told him if he left her, he would never see his daughter again. In November 2020, Edward asked Abigail to attend marriage counseling. He denied Abigail was unable to speak privately with the marriage counselor, but he explained that he sought a different marriage counselor for himself due to a difference of opinion with the first marriage counselor.

Edward acknowledged he had four guns in the family home, but he stated he always kept them locked away on a high shelf in the guest bedroom closet. He also acknowledged the occasion Abigail referenced in her declaration when one of his guns was on top of the piano. He stated he was sitting on the piano bench "inspecting the revolver in order to clean it." The gun was unloaded and not within his daughter's reach, and he put it away at Abigail's request.

Edward disputed Abigail was "in any reasonable apprehension of imminent serious bodily injury," noting she did not leave the home until nearly two weeks after the November

5

26, 2020 incident she described in her declaration (an incident of physical violence that he denied). He attached to his declaration friendly text messages Abigail sent him on December 3 and 7, 2020, before she left and filed the request for a restraining order.

Edward also attached to his declaration five checks Abigail made payable to her brother from her joint account with Edward, all dated December 9, 2020. Four of the checks were for $9,500 and one check was for $4,500, for a total of $42,500. Edward asserted in his declaration that "these five structured checks" violated title 31 of the United States Code section 5324, a statute captioned, "Structuring transactions to evade reporting requirement prohibited."

## II. The Hearing

On April 15, 2021, the trial court held an evidentiary hearing on Abigail's request for a domestic violence prevention restraining order. Both Abigail and Edward were represented by counsel at the hearing. Abigail and her brother testified in Abigail's case; Edward testified in his defense.

### A. Abigail's testimony

Abigail testified about the events she described in her declaration. Her testimony was consistent with her declaration in all material respects, and Edward does not argue otherwise on appeal.

Regarding Edward's four guns, Abigail testified he kept one locked in a safe in a bedroom closet, one loose on a shelf in the same bedroom closet, another loose on a bookshelf in his office (a converted bedroom), and the fourth loose in the garage. Abigail also stated that Edward had hunting knives "lying all over the place" that "were not locked up or anything."

6

Abigail stated that on an occasion in October 2020, Edward was in "a fit of rage." When she "told him to calm down," he responded that if she ever said that to him again, he would kill her. This testimony appears to concern one of the incidents Abigail described in her declaration.

Abigail testified about a November 2020 incident she referenced in her declaration during which Edward held a gun to his head and threatened to kill himself. She stated that Edward was on paid administrative leave from his employment. She believed he was having mental health issues and told him she thought he needed therapy. He picked up a gun from the bookshelf in his office, held it to his head, and said multiple times that he would shoot himself unless she told him to stop. She complied and told him to stop.

Abigail testified that she was "extremely afraid" of Edward and feared for the safety of herself, her daughter, and the rest of her family. On December 9, 2020, "[b]ecause Edward's behavior was getting worse from day to day," she made arrangements for her brother and his wife to meet her at a parking lot near her home and take her to their home.

On cross-examination by Edward's counsel, Abigail denied any suicidal thoughts and denied she had threatened to commit suicide in Edward's presence.

Also on cross-examination, Abigail acknowledged that on December 9, 2020, she transferred money from her joint bank account with Edward to her brother's bank account. She testified that she was employed prior to her marriage to Edward and for over a year during the marriage. On redirect examination, she stated that the money she transferred to her brother's bank account was money she had earned prior to her marriage, and

7

Edward had required her to add his name to the bank account containing that money.

Abigail testified on redirect examination about an incident in late 2017 during which Edward picked her up and "threw" her out the door of their bedroom in "a fit of rage" after she "playfully kicked" his abdomen, tickling him. He told her that he did not like to be tickled.

**B.      Testimony from Abigail's brother**

Abigail's brother testified he was concerned for Abigail's safety and the safety of their entire family due to Edward's "erratic behavior" (that he had witnessed) and the events Abigail had related to him. In or around November 2020, Abigail called him crying, stating Edward had purchased several firearms, had threatened to kill himself, and had threatened to kill her and her family if she left with their daughter. Abigail asked her brother to help her leave the family home, and they devised a plan for him to drive from Los Angeles (where he lived) to Central California (where she lived) to pick her up.

Edward's counsel cross-examined Abigail's brother.

**C.      Edward's testimony**

Regarding the November 26, 2020 incident Abigail referenced in her declaration and in her testimony, Edward acknowledged that he asked Abigail to watch a television program with him on that date and she declined. He stated that during their marriage counseling, she had agreed to "spend 30 minutes a day" with him at the counselor's recommendation, and then she "changed her mind" and did not want to spend any time with him. Edward denied that he threatened to kick her out of the house, threatened to kill her, or kicked her legs during that incident. He also denied that he had ever threatened to kill her

8

or any of her family members.  He further denied there was an incident in 2017 when he kicked her out of their bedroom, as she testified.

Edward testified consistently with his declaration regarding the storage of his guns and the incident during which he placed a gun on the piano when he was preparing to clean it. He stated he cleaned his guns about once a week.  He acknowledged he owned knives and stated he stored them in a box on the top shelf in the garage, around seven feet from the ground.

Edward denied he ever threatened to kill himself in the presence of Abigail and their daughter.  He reiterated the statements he made in his declaration that Abigail threatened to kill herself once in 2016 after he said he wanted to end their relationship.

Edward testified that Abigail was employed for around four years prior to their marriage and for around one year during their marriage.

"Sometime in 2020," Edward filed a petition for an annulment of the marriage.  The reasons Edward believed his marriage to Abigail was a fraud (on her part) are not material to our resolution of this appeal, and we need not set them forth here.  The parties' current marital status is unclear based on the record before us.

### D. Trial court's ruling and issuance of a permanent restraining order

After hearing closing arguments from counsel for the parties, the trial court gave its ruling.  The court found Abigail proved by a preponderance of the evidence that Edward engaged "in an act or acts of abuse within the meaning of the Family

9

Code." The court stated, "There was quite a bit of testimony that wasn't refuted." Edward interjected and informed the court that he refuted Abigail's statements and testimony relating to her claims against him. The court explained that it found Abigail's testimony to be credible, and the court was concerned about Edward cleaning his guns on a weekly basis in the presence of Abigail and the child, in light of the conflict between the parties. The court commented, "And I think it's credible that, if there were safety concerns going on, that somebody could interpret that [the weekly cleaning of the guns] as being threatening."

The trial court issued a three-year domestic violence prevention restraining order against Edward, protecting Abigail and their daughter, and requiring Edward to stay away from them and refrain from harassing or contacting them, except for peaceful contact through a coparenting communication application relating to visitation with the child. The restraining order precludes Edward from owning or possessing a firearm or ammunition.

The trial court heard argument from counsel for the parties, and had a discussion with the parties, regarding custody of and visitation with the child. The court granted Abigail sole legal and physical custody of the child, with Edward to have two hours of supervised visitation with his daughter on the weekend, and a 15-minute video visit two times during the week. The in-person visits must be "professionally supervised."

As Edward points out on appeal, the permanent restraining order is dated April 14, 2021 (next to the trial judge's signature on page five of form DV-130), although the evidentiary hearing occurred on April 15, 2021, and the court issued its minute order granting the request for a restraining order on April 15, 2021.

10

The permanent restraining order was filed on April 15, 2021 and expires on April 15, 2024. The reporter's transcript from the April 15, 2021 hearing reflects that Abigail's counsel was to submit the proposed permanent restraining order forms for the judge's signature *after* the hearing. Thus, the record indicates the April 14, 2021 date on the restraining order is a clerical error and, on this court's own motion, we will order the trial court to correct it to reflect the date of April 15, 2021 next to the judge's signature.

There was no mention at the hearing of Edward's Mexican descent or any reference to alleged statements by Abigail's brother or his wife about Mexico or Mexicans.

Edward appealed from the permanent restraining order and filed an opening brief as a self-represented litigant. Abigail did not file a respondent's brief.

## DISCUSSION

In his brief on appeal, Edward sets forth his contention as follows: "The court engaged in anti-Mexican racist bias with its decision as it ignored my denials both in court and in my written response declaration, as well as by finding me less credible without any cause to do so." As set forth above, at the hearing, there was no mention of Edward's Mexican descent or any reference to alleged statements by Abigail's brother or his wife about Mexico or Mexicans. Edward was the only person to reference such alleged statements in his declaration (but not at the hearing). Notwithstanding that, Edward argues the trial court could not have found in favor of Abigail unless the court was biased against him because he is Mexican. He asserts in his appellate brief: "Since there was no other evidence against me [other than his Mexican descent], and since I proved illegal

11

money transfers from both individuals testifying against me[,] there is no reason for the court to find them more credible than I, unless it does so simply because I am 'Mexican.' "

Edward did not raise this issue in the trial court, before or at the April 15, 2021 hearing when the court ruled against him, so his claim of judicial bias is forfeited on appeal. (See *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1218 [the defendants "did not preserve their claim of judicial bias for review because they did not object to the alleged improprieties and never asked the judge to correct remarks made or recuse himself"].) Even if Edward had preserved the claim for review, we would reject it because the record does not indicate the trial court was biased against him because of his race or ethnicity. The court made no comment from which such a bias could be inferred. To the extent Edward challenges the sufficiency of the evidence supporting the restraining order, his challenge fails under our standard of review, as set forth below.

The purpose of the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.) "is 'to prevent acts of domestic violence, abuse . . . and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence.' (§ 6220.) To this end, the DVPA provides for the issuance of restraining orders that enjoin specific acts of abuse. 'Abuse' is statutorily defined to include, among other things, to 'intentionally or recklessly cause or attempt to cause bodily injury' and to 'place a person in reasonable apprehension of imminent serious bodily injury to that person or another.' (§ 6203, subds. (a)(1) & (3).)" (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702 (*Fregoso*).) "Generally,

12

a trial court has broad discretion in determining whether to grant a petition for a restraining order under this statutory scheme. [Citation.] The DVPA permits a court, upon a showing of 'reasonable proof of a past act or acts of abuse' (§ 6300), to issue a protective order restraining any person from contact, for the purpose of preventing a recurrence of domestic violence." (*Ibid*.) "The DVPA requires a showing of past abuse by a preponderance of the evidence." (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226.)

"On review of an order granting or denying a protective order under the DVPA, we consider whether the trial court abused its discretion. [Citation.] ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.] We accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the [order]. [Citation.] Under the substantial evidence test, the pertinent inquiry is whether substantial evidence supports the court's finding—not whether a contrary finding might have been made." (*Fregoso*, *supra*, 5 Cal.App.5th at p. 702.) Thus, we resolve all " 'questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order.' " (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 849-850.)

The fact Abigail did not file a respondent's brief on appeal "does not affect [Edward]'s burden to show the [trial] court abused its discretion in issuing the DVPA restraining order." (*Fregoso*, *supra*, 5 Cal.App.5th at p. 702.) We "decide the appeal

13

on the record, the opening brief, and any oral argument by the appellant." (Cal. Rules of Court, rule 8.220(a)(2); *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.)

Edward does not dispute that if what Abigail stated in her declaration and testimony is true, the trial court did not err in granting the restraining order. For example, he does not argue the events Abigail described do not constitute abuse within the meaning of the DVPA (e.g., kicking her legs while she was holding their daughter, threatening to kill her, placing a gun to his head in front of her and their daughter). Instead, he asserts that because he denied the occurrence of any of the incidents of abuse Abigail described, her declaration and testimony (and her brother's testimony) were not credible. This argument fails under our standard of review. We "are not at liberty to reweigh the evidence or reappraise witness credibility." (*In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 587.) The trial court found Abigail to be credible, after Edward made clear to the court that he refuted her statements and testimony relating to her claims against him. Testimony of a single witness, even a party, may constitute substantial evidence supporting an order. (See Evid. Code, § 411; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Thus, Abigail's statements in her declaration and her testimony are sufficient evidence supporting issuance of the restraining order.

In the statement of facts in his appellate brief, Edward mentions he lost custody of his daughter as a result of Abigail's request for a restraining order. However, he does not specifically challenge the trial court's custody and visitation orders, separate and apart from his claims of judicial bias and insufficiency of the evidence supporting the restraining order.

The record does not show the trial court abused its discretion in granting the three-year domestic violence prevention restraining order. Accordingly, we affirm the order.[4]

## DISPOSITION

The trial court is ordered to correct the date on page five of the restraining order (form DV-130), next to the signature line, to reflect the date of April 15, 2021. As so modified, the order is affirmed. No costs are awarded on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.                    WEINGART, J.

---

[4] The record does not support Edward's claim that the trial judge "had already made up her mind the day before the hearing" to issue the permanent restraining order. The trial court heard testimony and argument from the parties before making its ruling on April 15, 2021, and the court's findings supporting issuance of the restraining order are supported by substantial evidence. As Edward points out, however, the date next to the judge's signature on the restraining order is April 14, 2021, the day before the April 15, 2021 evidentiary hearing. As we explained above, the record indicates the April 14, 2021 date is a clerical mistake, and we will order the trial court to correct it.