Filed 8/16/16  Lone Jack Ranch v. Perkins CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LONE JACK RANCH, LP,<br><br>        Plaintiff, Cross-defendant and Respondent,<br><br>        v.<br><br>VIRGINIA PERKINS,<br><br>        Defendant, Cross-complainant and Appellant. | D066920<br><br><br>(Super. Ct. No. GIN053365) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas, Judge.  Affirmed.

DeLano & DeLano, Everett L. DeLano III and M. Dare DeLano for Defendant, Cross-complainant and Appellant.

No appearance for the Plaintiff, Cross-defendant and Respondent.

# INTRODUCTION

This is the second appeal in a dispute between adjacent property owners, Lone Jack Ranch LP (Lone Jack Ranch) and Virginia Perkins (Virginia) regarding the use of a road across Lone Jack Ranch for access to Virginia's property.[1] Virginia asserts four contentions in this appeal: (1) the trial court improperly granted Lone Jack Ranch a directed verdict on her prescriptive easement claims, (2) the jury's finding that an irrevocable license to use the road may be revoked for failure to comply with reasonable requests to close and lock gates upon passing through Lone Jack Ranch is not supported by the law or the facts, (3) the use of gates fails to preserve Virginia's contract rights and unreasonably restricted her access rights, and (4) the trial court erred in denying her request for attorney fees on her contract claims. We disagree with each of these contentions and affirm the judgment.[2]

# BACKGROUND

## A

The parents of Virginia and Steve purchased property known as Perkins Ranch, as a second home in 1951 when Virginia was 11 years old. The property contained an old

---

[1]    Because Virginia and her brother, Steve Perkins, share a surname, we refer to them by their first names for clarity. No disrespect is intended. Virginia, the defendant herein, is sometimes referred to as "Ginger" in the record, presumably because she shared a first name with her mother. We refer to the defendant by her given name.

[2]    Lone Jack Ranch abandoned its cross-appeal in this matter indicating it was "financially unable to continue the protracted litigation and second round of appellate briefing." It stipulated with Virginia that each party would bear its own costs related to Lone Jack Ranch's cross-appeal. It did not file a respondent's brief.

copper mine. Lone Jack Ranch, the adjacent property, was owned by Ed Lloyd. The Perkins family lived in Los Angeles, but visited their property on weekends and holidays.

To access the Perkins Ranch, the Perkinses used RS181, which was previously developed as a mining road, across Lone Jack Ranch. There was no lake on Lone Jack Ranch at the time. At some point, the Army Corps of Engineers built a dam and a lake on Lone Jack Ranch, which inundated a portion of RS181. Lloyd had a dirt road graded around the lake for the use of the Perkinses. They started using the dirt road when it was built in 1952 or 1953. There was no dispute between the Perkins family and Lloyd after construction of the lake about the use of the dirt road.

The Perkins family sold their Los Angeles home in the late 1960s and moved to the Perkins Ranch when Virginia was 28 years old. Virginia stayed in Los Angeles for a number of years. She moved in with her parents at the Perkins Ranch in 1981 for about six months until she moved into her Encinitas home.

In 1975, Ken Liberty purchased Lone Jack Ranch and developed a close relationship with the Perkins family. They socialized and had dinners together. Liberty was "pulled into the family" and described Steve as his closest friend. Liberty did not ask the Perkinses to stop using the dirt road.

The Perkinses developed a disagreement with Liberty in 1979 or 1980 because they wanted to build a new road through Lone Jack Ranch for purposes of building a subdivision on their property. Liberty did not want to destroy the dam for the road.

The Perkinses sued Liberty. They entered into a settlement agreement in 1981 (1981 Settlement Agreement). Liberty agreed not to oppose efforts by the Perkins family

3

to "improve and utilize" RS181 as access to their property, which the County of San Diego was to realign to avoid the lake. Liberty granted the Perkins family a 40-foot easement over the newly aligned road, which was outside of the area where the dirt road was located, and granted "all necessary temporary easements and rights of entry" necessary for the construction of RS181.

As part of the 1981 Settlement Agreement, the Perkinses agreed "not to oppose any efforts" by Liberty "to close, revegetate, or otherwise barricade [the] existing dirt road upon completion of the new alignment of RS181, it being understood that upon implementation of this settlement agreement there shall be but one public roadway traversing the Liberty property, namely the new alignment of RS181." The 1981 Settlement Agreement also provided, "[u]pon demand the Perkinses shall quitclaim to [Liberty] any and all interest they and their family may have in the dirt road which currently traverses the Liberty property, provided the Perkinses shall not quitclaim any interest in such dirt road unless and until the new alignment of RS181 as herein described is ready and available for access use by the Perkinses." (Some capitalization omitted.)[3]

In the prior appeal we described the parties conduct after they entered into the 1981 Settlement Agreement: "Pursuant to the settlement agreement, in August 1981 Liberty caused a grant of easement over [RS181] in favor of the Perkinses to be recorded.

_____

[3]    In the prior appeal, we concluded the agreement did not deprive the Perkinses of any prescriptive rights in the dirt road on the mere drawing of the realignment of RS181. However, we also concluded the 1981 Settlement Agreement "did not determine whether the Perkinses, or their successors, actually had prescriptive rights of access over the dirt road." (*Lone Jack Ranch, LP v. Virginia Perkins* (Mar. 1, 2013, D060995) [nonpub.opn.].)

4

The grant permitted the Perkinses to irrevocably offer to dedicate the easement to the County 'as part of the public road system.' In turn, the Perkinses made an irrevocable offer of dedication of the easement to the County. In October 1981 a parcel map for a tentative subdivision map for Perkins Ranch was approved and recorded. In December 1981 the County drew the new alignment of [RS181] to go around the lake, and the County vacated the old alignment." (*Lone Jack Ranch, LP v. Virginia Perkins*, *supra*, D060995, fn. omitted.)

The Perkinses and Liberty remained friendly and courteous thereafter. The Perkinses continued using the dirt road and Liberty did not ask them to stop doing so after they entered into the 1981 Settlement Agreement. The Perkins family has never done anything to construct a roadway within the 40-foot easement agreed to in the 1981 Settlement Agreement.

Virginia frequently visited the property from 1981 until 2002 when her mother passed away. For the next several years, she visited the property infrequently until she acquired the property in 2006.

Steve testified he worked on the dirt road over the years with his tractor and helped build up the road with gravel and decomposed granite, which was delivered to the property at the expense of the Perkinses. Steve maintained the road superficially after a rain. Virginia observed him use the tractor to maintain the dirt road on the Lone Jack Ranch property a few times between 1981 and 2005.

5

B

Jeffrey Moses purchased Lone Jack Ranch in 1994.[4] As an outdoorsman with two young boys, Moses considered the property on the edge of town to be a dream. His boys built rafts and his daughter learned to swim in the lake. They hosted Boy Scout events and fishing contests. Moses envisioned having a peaceful place to live in his later years.

Moses understood the Perkins family used a dirt roadway across his property to access their property. Moses did not object to their use of the roadway.

As a result of the agreement with the prior owner of Lone Jack Ranch, he understood the property was subject to a 40-foot easement upon which the Perkins family could build a road. The easement was in a different location than the dirt road the Perkins family used.

Moses paved the dirt roadway from the entrance gate and the left fork of the roadway going into his driveway at a cost of about $35,000. The Perkins family contributed a couple of thousand dollars to the project. The Perkins family did not pave the right fork of the road which led to their property.

Lone Jack Ranch was fenced and gated when Moses purchased it.[5] However, the gates and fencing were old and Moses replaced them for the safety of his family and to prevent liability from trespassers. The Perkins family did not object.

---

[4]    After a divorce, Moses transferred title of the property to Lone Jack Ranch, L.P. for estate planning purposes.

[5]    Steve described the gates as "stock" gates used for cattle, which were extensions of barbed wire fencing that could be opened and closed.

In the late 1990s Moses talked with Steve about making the gates to the properties more secure due to concerns about trespassers. Individuals trespassed on both properties with motorcycles and four-wheeled vehicles and used guns for target practice. Moses had problems with bonfire parties and underage drinking at the lake on his property. He encountered a group of young people carrying a rubber raft with paddles and an ice chest full of beer headed to his lake. They came through the back gate of his property. He also found a young couple using a row boat on the lake with their infant child.

Moses and Steve discussed the need for stronger gates because they both wanted to stop the trespassers. Steve offered an old electric gate, but they decided to purchase a new gate. Steve contributed to the cost of the new gate at the front of Lone Jack Ranch property. It was an electric gate with a radio controller, like a garage door opener, as well as a keypad with programmable codes. It also had a telephone system to open the gate.

After the front and back gates were installed, both Steve and Moses acted in concert to keep the gates closed to prevent trespassers. If Moses saw the rear gate open, he would close it.[6]

After their mother passed away in 2002, the Perkins children split the property into three two-parcel segments and Virginia obtained the ranch house.

## C

In 2004, Moses encountered Virginia driving through the property as he was working near the front of the property. She stopped and said in an angry and

---

[6] Steve denied the back gate was closed while he was living on the property.

confrontational way that she intended to tear down the gate and put a public road through the property. After Virginia moved into the property, the rear gate was not closed on a consistent basis, but Moses would close it when he saw it open.

Moses sent Steve and Virginia a number of letters asking them to close and lock the gates. In October 2004, Moses sent Steve a letter indicating the front gate had been repaired after damage Steve caused. Moses also stated he planned to change the gate access code and provided the new code number along with a telephone number of the gate company to change the new code, if they desired. Moses paid for the gate repair. Moses received no response to this letter. There was no lock on the back gate at the time.

Moses sent Steve another letter in January 2006 asking the Perkinses to lock the gate at the back of the property. The letter noted the Moses family had been " 'pestered by trespassers [and] joggers,' et cetera 'coming through your property from the other side. They insist that they have been given permission by someone at your residence to pass through.' " He asked the Perkinses to comply with his requests to keep the gates locked because he intended to purchase some farm animals and because he was concerned about liability for young people "attempting to fish and party on the waterfront." Moses was also concerned about their daughter being alone on the property while Moses and his wife traveled on mission trips.

The letter included a lock to be joined with a lock Moses placed on the gate, which would allow the Perkinses to open the lock series. Moses asked the Perkinses to lock the gate after they passed through to secure the property. The Perkinses never installed the lock.

8

Virginia first objected to the presence of the rear gate in 2006. Virginia sent a letter stating they had legal access to their property across Moses's property for over a hundred years and Moses had ignored a demand to remove a gate. It went on to state he had "now closed another gate," which Moses understood to mean the back gate. It demanded that both gates remain open.

Moses responded with another letter referring to his prior letter to Steve requesting the gates be locked and including a set of locks. He again asked for the gates to be closed and locked for security reasons and to prevent egress of the animals he intended to acquire. The letter also noted the Perkinses' gate access code had been posted on the front gate for anyone to open the gate. He expressed concern about this endangering the safety of their daughter who sometimes stayed on the property alone. He did not receive a response to this letter and the gates were never closed.

Moses wrote to the Perkinses in March 2006 stating their gate access code had again been posted on the front gate keypad, this time in indelible marking pen. He expressed concern about this conduct allowing "anyone and everyone complete access to our home, lake and property." He noted this was done after the signed receipt of his previous letter expressing concern about this conduct. The letter also noted they repeatedly left the back gate open making it impossible for Moses to proceed with the purchase of the animals as planned and placing the Moses family at risk of trespassers. Moses received a return receipt, but no response to this letter.

Moses retained an attorney who sent another letter advising the Perkinses their conduct in leaving the gates open, writing the security codes on the locked gates, and

9

allowing the public to access the Moses property was unacceptable. The letter indicated Moses would pursue legal remedies if he did not receive a response.

When Moses returned from a trip on May 21, 2006, he received a letter from a consultant who indicated the Army Corps of Engineers had sent a letter to the wrong address. It also indicated the consultant observed dirt and rock debris had been dumped on Moses's property while he was away. Moses was surprised because he had not authorized anyone to dump dirt on his property.

The letter from the Army Corps of Engineers was dated almost a year earlier and was sent to the wrong address. It indicated Moses or his contractors had discharged dredged or fill material into a tributary of the Escondido Creek. Moses was surprised at this letter. He later learned this was related to work he had done to clear out a culvert when the dam in his lake had been close to overflowing during heavy rains. He resolved the issue with the Army Corps of Engineers by planting some trees near the culvert.

On the morning of May 22, 2006, as he was having breakfast, he noticed a dump truck dumping dirt on his property. Moses ran down the driveway in his pajamas and slippers to talk to the driver. When Moses asked the driver what he was doing, the driver said truck drivers in the area had been told this was a place where dirt could be dumped. Moses corrected the driver, told him to leave, and told him to tell others they could not dump dirt on his property. Moses was very upset.

Moses wrote to the Perkinses stating it had "become apparent that the gate code has been acquired by certain people that have taken illegal advantage of my property and dumped dirt and vegetation and debris." Moses again asked them not to post the gate

code.  He stated he would change the gate access code again, and provided the new code number.  Moses received no response and the gates were still left open.

D

Moses filed suit in June 2006.  A couple of months later, Moses sent another letter to the Perkinses stating they repeatedly left the driveway gate open and again posted the gate access code on the keypad.  Moses advised he would again change the gate access code and provided the new code.  Additionally, he advised he would be placing a combination lock on the back gate and provided the combination.  He again asked them to keep the gate closed and locked.  He said if they continued abusing the "courtesy use of our driveway in lieu of your easement," he would pursue further action.  Moses received no response to this letter and the back gate was not closed.

Moses delivered a letter to Virginia regarding an encounter he had with her and a sheriff's deputy at his front gate on August 16, 2006.  He reiterated he would not tolerate her posting the gate access code outside the gate.  He described her demeanor as contentious and argumentative when he went with her to the back gate to show her how to open the combination lock.  He asked her to respect the polite use of his driveway, which he had given her permission to use.  Virginia stated she would do whatever she pleased.

Later that evening, after returning home from taking his wife to dinner and the movies, Moses checked the back gate.  He found it was open and a piece of paper was attached to a post providing the combination for the lock.

11

Moses wrote a letter to Virginia revoking permission to use his private driveway access. When Virginia came onto his property with a line of heavy equipment the next morning, he went out to meet them and to warn them he wanted reimbursement if they damaged his driveway. He delivered the letter to Virginia, told her he was going to change the gate access code again, and provided the new code.

Virginia claimed she was locked out of her property from August 18, 2006, until the first week of October 2006. She said she visited her property on one occasion during that time by taking an alternate route across other property and on a rough fire road.

Moses purchased a new lock for the back gate and changed the gate access codes to match. He understood Virginia had a remote control to operate the front gate, which did not change when the code changed.

Moses received a letter from Virginia's attorney stating the rear gate needed to remain open due to her back condition. Moses saw Virginia cross his property twice on September 1, 2006, during a period of time she later claimed she was locked out. She did not ask for assistance entering or exiting the property.

As requested by Virginia's attorney, Moses left the back gate open for several days while she was having work done on her house. He also left it open at her request for Thanksgiving.

Moses paid $2,000 to $3,000 for repairs to the front gate and approximately $4,000 for electricity and telephone hookups for the gate. The Perkins family did not contribute anything to the gate service or repairs since the gate was installed. Similarly,

12

they did not contribute to the road maintenance or repairs since the driveway was first paved.

Virginia stated she posted the gate access codes for short periods of time due to emergency situations or because contractors were coming to work on her property. She also stated she injured her back when operating the back gate. She denied receiving the letters Moses sent except for one she said was posted on their property and another Moses threw into her truck.

She also stated she observed Moses engaging in illegal activities on his property since 2004 and felt his actions in locking the gates were retaliatory because her family reported the activities. She testified she believed they should have free, unfettered access, without gates, to her property to avoid conflict between the neighbors.

E

The court granted Lone Jack Ranch's motion for a directed verdict on Virginia's cross-complaint asserting a prescriptive easement. The court concluded there was no evidence of adverse use of the dirt road with adverse intent. Instead, the court determined the use was permissive.

The jury determined Virginia had a contractual right under the 1981 Settlement Agreement to access her property across Lone Jack Ranch by using the dirt road until RS181 is constructed. The jury also found Virginia had a license to use the "private" or dirt road and the license became irrevocable based upon the money and labor the Perkins family expended on the road. However, the jury determined the license "[b]ecomes revocable if [Virginia] and family, visitors, etc. do not comply with [Moses's] reasonable

13

request to close gates when passing in and out of [Moses's] property." The jury found the license permitted Lone Jack Ranch to gate the front and back of the property and it did not unreasonably interfere with Virginia's access rights.

The jury found in favor of Lone Jack Ranch on Virginia's claim of financial elder abuse when it determined Lone Jack Ranch did not take or retain Virginia's property for a wrongful purpose.

The court denied Virginia's motion for new trial on the prescriptive easement and also denied her motion to declare an easement by estoppel finding the facts did not support such an easement. Even if the issue were properly before the trial court, it noted it would rule against Virginia as a matter of equity. The court stated, "[s]he was not persuasive or credible in her descriptions of how the use of the road came to pass. She was argumentative during examination and attempted to get improper matters before the jury." Finally, the court denied the motion for judgment notwithstanding the verdict regarding the imposition of conditions on the irrevocable license. The court stated, in its evaluation of the evidence, "the jury made exactly the correct decision. Leaving the gate open, posting of the gate code or otherwise causing the gate to be accessed by strangers was and is unreasonable and a threat to the safety and security of [Lone Jack Ranch]."

The court entered judgment declaring "[Lone Jack Ranch] is and was entitled to gate and lock its property at both the northern and southern borders; [Virginia] has no prescriptive rights in the private road traversing Lone Jack Ranch; [Lone Jack Ranch] is entitled to gate Lone Jack Ranch; and [Lone Jack Ranch] did not unreasonably interfere with [Virginia's] access rights." The judgment denied all relief on Virginia's operative

14

cross-complaint "except to the extent the jury found that [Virginia] has an irrevocable license to use the private road easement until RS181 is constructed so long as [Virginia] and family, visitors, etc. comply with [Lone Jack Ranch's] reasonable request to close gates when passing in and out of Lone Jack Ranch.  [Virginia's] (and her … family, visitors, etc.) failure to comply with [Lone Jack Ranch's] reasonable request to close gates when passing in and out of Lone Jack Ranch will result in the irrevocable license becoming revocable."

The court determined neither party prevailed and each party should bear its own attorney fees and costs.  It awarded Virginia $2,418.34 in costs for her prior appeal.

DISCUSSION

I

*Prescriptive Easement*

Virginia contends the trial court erred in granting Lone Jack a directed verdict on Virginia's prescriptive easement claim as to the dirt road.  We do not agree.

A court may remove an issue of fact from the jury and direct a verdict on the issue if there is "no evidence tending to prove the case of the party opposing the motion [for directed verdict]."  (*Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 597.)  In reviewing the issue on appeal, "we stand in the shoes of the trial court" and "will reverse if there was substantial evidence tending to prove appellant['s] case and the state of the law supports the claim."  (*North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 920.)

15

"A prescriptive easement is established by use of land that is (1) open and notorious, (2) continuous and uninterrupted, and (3) adverse to the true owner, and that is all of these things (4) for a period of five years." (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 270 (*Windsor*); Civ. Code, § 1007; Code Civ. Proc., § 321.)

"[A] prescriptive right to land will not be acquired through its use by license of the owner, or by his permission, express or implied." (*Richmond Ramblers Motorcycle Club v. Western Title Guaranty Co.* (1975) 47 Cal.App.3d 747, 754, italics omitted.) This is so because "[u]se with the owner's permission … is not adverse to the owner." (*Windsor*, *supra*, 213 Cal.App.4th at p. 271.)

Neighborly accommodation as a friendly or kind gesture does not ordinarily ripen into a prescriptive right. (6 Miller & Starr Cal. Real Estate (4th ed. 2016) § 15:36, citing *Clarke v. Clarke* (1901) 133 Cal. 667, 671 [the law does not presume an owner intends to give away land when he or she, as an act of kindness, allows others to travel over a lot without objection]; see *Grant v. Ratcliff* (2008) 164 Cal.App.4th 1304, 1310 [use of a road as a matter of family accommodation was not adverse and did not give rise to a prescriptive right].) "Permission sufficient to establish a license can be express or implied. [Citation.] ' "A license to use real property may be … proved by circumstances such as tacit permission or acquiescence in acts already done …." ' [Citation.] A license may also arise by implication from acts of the parties, from their relations, or from custom. When a landowner knowingly permits another to perform acts on his land, a

16

license may be implied from his failure to object." (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 755 (*Richardson*).)

"Once permission is given, it is presumed to continue until the user communicates to the servient tenement owner a clear and unqualified disclaimer and repudiation of the permission." (6 Miller & Starr, Cal. Real Estate (4th ed. 2016) §15:36, citing *Southern Pacific Co. v. San Francisco* (1964) 62 Cal.2d 50, 56 ["one who uses land with the consent of the owner may effect an ouster for purposes of adverse possession by unqualified and definite renunciation of subordination to the owner … of sufficient clarity to put the owner on notice that subsequent possession is adverse to his title, for the very essence of the requirement of ouster is *notice*."].) The requirement for adverse use "ensures that a prescriptive easement can arise only if the owner had an opportunity to protect his or her rights by taking legal action to prevent the wrongful use, yet failed to do so." (*Windsor*, *supra*, 213 Cal.App.4th at p. 271.)

The court determined there was no evidence the Perkinses' use of the land was adverse or hostile before 2004. Lloyd had the Army Corps of Engineers build the dirt road for the use of the Perkins family when the building of the dam inundated RS181.

When Liberty owned Lone Jack Ranch, the Perkinses developed a close relationship with him. They treated him like family and he did not object to their use of the road. Even when the Perkinses and Liberty later developed a disagreement about building a public road to access a proposed subdivision on the Perkinses' property, the dispute involved rebuilding RS181 through the lake. To avoid draining the lake to allow access, Liberty, as part of the 1981 Settlement Agreement, granted an easement, outside

17

the area of the dirt road, on which to build a public road.  He also granted the Perkinses temporary access rights until they could build the road.  When they used the dirt road thereafter, Liberty remained courteous and made no objection to their use of the dirt road.

When Moses obtained the property, he understood the Perkins family had a custom of using the dirt road to access their property.  He had a courteous relationship with Steve and cooperated with him in obtaining and installing the front gate.  He did not object to the Perkinses' continued use of the road.

This evidence showed Moses and the prior owners permitted the Perkins family to use the dirt road across Lone Jack Ranch as a neighborly accommodation.  Even though Steve did some work on the dirt road and paid some money toward maintenance of the road and the front gate, there is no indication this was done in contravention of the permissive access granted to the Perkinses by the successive owners of Lone Jack Ranch.  Since there was evidence of permissive use, we need not reach the issue of whether continuous use over a long period of time without interference is presumptive evidence of a prescriptive right.  (See *Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 571-572; *Grant v. Ratliff*, *supra*, 164 Cal.App.4th at p. 1310.)

Virginia produced no evidence the Perkinses' use of the road was done in such a manner as to place Moses or any prior owner on notice that the use of their road was intended to be adverse or hostile to the owners of Lone Jack Ranch.  No adverse use was evident until 2004 when Virginia asserted a right to use the road without cooperating with closing the gates.  The court properly granted nonsuit on the issue of prescription.

## II

### *Scope of Irrevocable License*

Virginia contends the determination the Perkinses' irrevocable license will become revocable if the Perkinses and their visitors fail to comply with reasonable requests to close gates when passing in and out of Lone Jack Ranch is not supported by the law or the facts and the verdict form was defective.  We disagree.

"An otherwise revocable license becomes irrevocable when the licensee, acting in reasonable reliance either on the licensor's representations or on the terms of the license, makes substantial expenditures of money or labor in the execution of the license, and the license will continue 'for so long a time as the nature of it calls for.'  [Citations.] … 'A license remains irrevocable for a period sufficient to enable the licensee to capitalize on his or her investment.  He [or she] can continue to use it only so long as justice and equity require its use.' "  (*Richardson*, *supra*, 233 Cal.App.4th at pp. 757-758.)  "[T]he grant of an irrevocable license is 'based in equity.'  After the trial court has exercised its equitable powers, the appellate court reviews the judgment under the abuse of discretion standard." (*Id*. at p. 751.)

In *Richardson*, *supra*, 233 Cal.App.4th 744, to access their home, homeowners traversed land belonging to their neighbors using an easement authorized for " 'access and public utility purposes.' "  Over the course of 20 years, the homeowners and their predecessors invested significant amounts of money in installing and maintaining landscaping, irrigation and lighting on both sides of the easement without objection. Litigation ensued when the neighbors asserted the landscaping and other improvements

19

exceeded the purpose for which the easement was granted and demanded their removal. (*Id*. at pp. 747-748.) The court found the granting of an irrevocable license within an easement of specified dimensions was within the trial court's equitable powers. (*Id*. at pp. 750, 757-758.)

In this case, a special jury instruction was used to instruct the jury on the law regarding licenses and how they become irrevocable. The special jury instruction stated in pertinent part: "where [the] Perkinses entered under a license and has expended money, or its equivalent in labor, in the execution of the license, the license becomes irrevocable, the Perkinses will have a right of entry upon the land of Moses for so long a time as the nature of it calls for."

The jury determined the license to use the dirt road became irrevocable based upon the money and labor expended by the Perkins family for maintaining the road. This grants use of the dirt road for as long as the Perkinses have need of it. However, the jury also determined the license may become revocable if the Perkinses and their guests do not comply with reasonable requests to close gates when they pass in and out of Lone Jack Ranch.

Contrary to Virginia's assertion, there was evidence to support the jury's determination the license for access across Lone Jack Road included the condition of reasonable compliance with gates. Gates were not new to the property in 2004 when Virginia began objecting to their use. Moses testified there was fencing and gates on the property when he purchased it. Steve confirmed as much when he indicated there were stock gates on the property. In addition, Moses testified he and Steve discussed

20

improving the security of both properties by improving the gates and Steve contributed to the cost of the front gate. Although Steve and Virginia denied at trial the back gate was routinely closed, the jury was free to disbelieve their testimony and to believe the testimony of Moses who said he and Steve worked together to make sure the back gates were closed.

Virginia did not object to the form of the jury verdict asking how long the irrevocable license would last. Additionally, when the jury asked if they could formulate their response to when the irrevocable license becomes revocable as an event or occurrence the parties agreed. Failure to object to a defective jury verdict or to request clarification before the jury is discharged forfeits a challenge to the validity of the verdict. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-268.)

In any event, the court also had broad equitable powers to consider the scope of the irrevocable license. In ruling on Virginia's posttrial motions, the court rejected a challenge to the imposition of conditions on the irrevocable license. It stated, "The jury's response [to when/what would make the irrevocable license revocable] was reasonable. Indeed, in the [c]ourt's evaluation of the evidence, the jury made exactly the correct decision. Leaving the gate open, posting of the gate code or otherwise causing the gate to be accessed by strangers was and is unreasonable and a threat to the safety and security of [Moses] and the occupants of [Moses's] house."

The court had broad discretion to frame an equitable result on the issue of the scope and duration of the irrevocable license. "There is a long tradition in equity of according trial courts great latitude to ' "mold and adjust their decrees as to award

21

substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." [Citation.]' [Citations.] Discretion is abused only when the trial court's decision 'exceeded the bounds of reason.' " (*Richardson*, *supra*, 233 Cal.App.4th at p. 757.)

We conclude the trial court did not abuse its discretion in adopting the jury's determination the irrevocable license was subject to the condition of compliance with reasonable requests to close and lock gates when passing through Lone Jack Ranch and failure to comply with such reasonable requests will result in revocation of the license. Given the limited investment the Perkinses made in the dirt road over the years and the history of the use of the property, this was a fair exercise of the court's powers to fashion equitable relief for both parties.

III

*Gate Conditions Do Not Interfere with Contractual Rights and Substantial Evidence Supports the Jury's Verdict of No Unreasonable Interference*

Virginia also contends the gate conditions interfere with her contractual access rights under the 1981 Settlement Agreement and substantial evidence did not support the jury's determination the use of gates did not unreasonably restrict her access rights. We disagree with both contentions.

A

The jury determined "the 1981 Settlement Agreement provide[d] the Perkins[es] a right to access their property across Lone Jack Ranch via the 'dirt road' until RS181 is constructed." It granted the Perkins family temporary easements and access rights

22

necessary to construct and improve the new alignment of RS181.  The Perkinses agreed, upon demand, to relinquish any interest they had in the dirt road when the new road was available for access so only one road would be used to access their property.

The contract does not mention the use of gates, but it also does not necessarily require unfettered access to the property.  As stated above, the history of the property, before and after the 1981 Settlement Agreement, involved the use of gates without objection before 2004.  This " 'course of performance' " evidence is relevant to construing the terms of the 1981 Settlement Agreement.  (Code Civ. Proc., 1856, subd. (c).)  " '[T]he course of actual performance by the parties is considered the best indication of what the parties intended the writing to mean.  …'  [Citation.]  '[C]ourse of performance' in this context means '[a] sequence of previous performance by either party after an agreement has been entered into, when a contract involves repeated occasions for performance and both parties know the nature of the performance and have an opportunity to object to it. … *A course of performance accepted or acquiesced in without objection is relevant to determining the meaning of the agreement*.' "  (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1355.)  Therefore, we conclude the use of gates and reasonable requests to close and lock gates upon passing through Lone Jack Ranch does not interfere with any contractual rights under the 1981 Settlement Agreement.

B

Virginia acknowledges " '[w]hether a particular use by the servient owner of land subject to an easement [or license] is an unreasonable interference with the rights of the

23

dominant owner is a question of fact for the trier of fact,' whose findings are binding upon the appellate court if properly supported by the evidence." (*Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1599.)

Here, there was substantial evidence supporting the jury's finding that the use of gates did not unreasonably interfere with the Perkinses access. Moses presented evidence of security concerns related to trespassers. Moses provided gate access codes to the Perkinses and attempted to demonstrate to Virginia how to operate the gates. There was also evidence both sheriff and fire departments could open the gates in the event of an emergency. Although there was some evidence the electric gate may not operate when the power is out, there was also evidence it was possible to open the gate manually to exit the property. The jury was free to believe the testimony of Moses in this regard and to disregard or disbelieve Virginia's contrary testimony. Indeed, the trial court observed Virginia's testimony was not persuasive or credible and both she and her daughter attempted to introduce improper matter to the jury. We conclude there was substantial evidence to support the jury's determination the use of gates in this case did not unreasonably interfere with access rights.

IV

*Attorney Fees*

Finally, we do not agree with Virginia's contention the court erred in denying her attorney fees because she was the prevailing party on her contract claim.

"[Civil Code section] 1717, subdivision (a) provides for an award of attorney fees to 'the party prevailing on the contract.' Under [Civil Code] section 1717, subdivision

24

(b)(1), the prevailing party is the party 'who recovered a *greater relief* in the action on the contract.' (Italics added.) [Civil Code section] 1717 allows 'those parties whose litigation success is not fairly disputable to claim attorney fees as a matter of right.' [Citation.] [¶] 'If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees.' [Citations.] '[I]n deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by "a comparison of the extent to which each party [had] succeeded and failed to succeed in its contentions." ' " (*In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 577, quoting *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 and *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109.)

"A trial court has broad discretion in determining which party has obtained greater relief on the contract, and we will not disturb such a determination on appeal absent a clear abuse of discretion." (*In re Tobacco Cases I*, *supra*, 216 Cal.App.4th at p. 578.)

Virginia's cross-complaint sought damages for breach of contract alleging the construction of the gates was a breach of the 1981 Settlement Agreement "that unreasonably restricted [Virginia] access to her property via the dirt road." Although the jury agreed the 1981 Settlement Agreement provided her a contractual right to access her

25

property by way of the dirt road until RS181 is constructed, the jury did not find the use of gates was an unreasonable interference with that right and denied her request for damages. Therefore, she did not obtain a " 'simple, unqualified win' " on her contract claim. (*Hsu v. Abbara*, *supra*, 9 Cal.4th at p. 877.)

In determining neither party prevailed, the court stated, "[Lone Jack Ranch] sought to deny access to [Virginia], and lost that right. [Virginia] sought to prevent the use of gates, and obtain an easement of far greater right than what she was ultimately awarded. She lost on most levels." We conclude the court acted well within its discretion to determine neither party prevailed in this action.

## DISPOSITION

The judgment is affirmed. Lone Jack Ranch is entitled to its costs related to Virginia's appeal.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

McDONALD, J.

26